# EXHIBIT 42

0000001748


DEPARTMENT OF HEALTH & HUMAN SERVICES
Case 1:05-cv-01449-RJL   Document 15-2   Filed 01/25/2006   Page 2 of 7
Program Support Center

Rockville MD 20857

April 15, 2005

Reverend Lawrence W. Rice, Jr.
President
New Life Evangelistic Center, Inc.
1411 Locust St.
St. Louis, Missouri 63103

Re:   L. Douglas Abram Federal Building
      1520 Market St.
      St. Louis, Missouri
      GSA No: 7-G-MO-0636

Dear Reverend Rice:

This is in response to your application dated February 14, 2005 ("the application"), on behalf of New Life Evangelistic Center, Inc. ("New Life"), applicant, to acquire the above-referenced property for use to assist the homeless pursuant to the provisions of Title V of the McKinney-Vento Homeless Assistance Act ("Title V"). 42 U.S.C. § 11411. HHS reviews all applications for surplus Federal property to assist the homeless using the following five evaluation criteria promulgated by the Title V joint Federal agency regulation (in order of priority): services offered; need; implementation time; experience; and financial ability. See 45 C.F.R. Part 12a, section 12a.9(e).

After performing a thorough review of the application and attachments applying the foregoing evaluation criteria, HHS has concluded that the application is not approvable. As explained in more detail below, HHS has determined that the application fails to describe the type of programmatic infrastructure necessary to support the wide range of proposed services. The application also fails to make a satisfactory showing that New Life has the relevant experience and financial ability to rehabilitate and operate the Abram Federal Building and to implement the proposed program of use in the facility.

Services Offered
The application outlines a large-scale homeless services program that intends to combine the existence of both emergency and long-term shelter opportunities for up to 750 persons experiencing homelessness per day with an extensive array of support services for residents and non-residents. The services would include the provision of 70 emergency shelter beds for elderly

0000001749

and disabled men and to accommodate overflow conditions from the 1411 Locust Street facility; 100 emergency shelter beds for up to 25 families who are in crisis or have special needs (such as a father with his children); 200 beds of long-term emergency housing for women and children; and 55 long-term transitional housing units for large families (35 units will have four bedrooms and 20 units will have three bedrooms). The extensive range of supportive services for homeless persons includes vocational training, drug and alcohol abuse counseling, and food services through the operation of an on-site cafeteria.

The application is deficient in demonstrating how New Life can effectively deliver high quality, evidence-based services to assist the proposed range of consumers in becoming self-sufficient. The training programs and peer staffing components of your proposal are commendable. However, the application reveals deficiencies in the professional staffing plan for a program of this magnitude. This is a key deficiency that we have concluded would preclude the program's proposed services from being successfully administered in the Abram Federal Building.

New Life proposes to serve a range of persons experiencing homelessness, from elderly, disabled men to families with children in crisis. While each of these populations has a unique set of service needs, previous research indicates that the homeless population has a high prevalence rate for a range of disabilities requiring professional treatment or counseling. Nationally, 46% of individuals experiencing homelessness report one or more chronic health conditions, 86% report at least one alcohol/drug/or mental health problem during his/her lifetime, and 54% report having been incarcerated for at least five days over his/her lifetime. Heads of homeless families have similar prevalence rates, with 65% having received prior mental health counseling, 14% having been treated for an alcohol problem, and 24% having a history of treatment for drug abuse.[1] It is well established that the reasons for becoming homeless range from inappropriate discharge from a public facility, to domestic violence, to the inability to make necessary rent or utility payments, or release from incarceration. Considering the prevalence of these disabling conditions among persons experiencing homelessness nationally, it can be expected that New Life's proposed consumer population will experience similar conditions.

The application's plan to deliver medical, mental health and substance abuse services to a daily consumer population of up to 750 persons experiencing homelessness while relying on only one case manager, one case worker, and an unspecified number of trainees and volunteers will not accomplish the intended purpose. The application identifies only one certified adult nurse practitioner to run a health clinic two mornings per week to serve all persons experiencing homelessness, both residents and nonresidents. "Drug/alcohol treatment and counseling/mental health referrals" are proposed to be delivered by an unspecified number of New Life certified/licensed substance abuse counselors, one New Life case manager, one New Life "program staff," and one volunteer. No mention is made of certified social workers,

---

[1] Burt, M.R., Aron, L.Y., Douglas, T., Valente, J., Lee, E., and Iwen, B. 1999. Homelessness- Programs and the People They Serve: Technical Report. Washington, D.C.: Interagency Council on Homelessness/Department of Housing and Urban Development.

Page 2

0000001750

psychologists, or psychiatrists committed to serving the consumers of the program, either as staff members or through other arrangements with providers in the community. Research on the practice of case management for severely and persistently mentally ill consumers--a category highly represented in the proposed consumer population--has identified Assertive Community Treatment (ACT) to be the ideal model in case management practices. ACT promotes a staff-to-consumer ratio of no more than ten to fifteen consumers per full-time case manager. Given the high prevalence of both mental health and substance abuse disorders within the population to be served, the serious medical nature of these conditions, and the volume of consumers to be served, the proposed staffing arrangements are not sufficient to implement the proposed services program.

The application also lacks important specific information detailing how staff will be hired, deployed, and managed throughout the program and the facility. The application references the use of a multi-disciplinary team approach in providing services, but provides no explanation as to how this team is to be assembled and then managed to ensure the delivery of appropriate services. For example, page 34 of the application addresses "clinical oversight," but provides little more than an acknowledgment that clinical oversight will occur. Again, the application fails to describe what procedures, if any, would be followed to deliver clinical oversight or how problems would be resolved. Given the scope and diversity of this program's proposed services, a significant level of programmatic detail is required to show that the services can in fact be delivered by this program.

Our review also concludes that the application's proposed security measures are inadequate to provide a safe and secure environment for the consumer population in a facility of this size. The application identified only one professional security services supervisor, one security services trainer and 12 security officers to be trained in New Life's training program. Our review has determined that a building containing an estimated 272,580 useable square feet (471,024 gross square feet), with a potential to house more than 500 clients each evening, needs a far more robust security plan to assure the public health and safety of each resident and all four floors of the building 24 hours a day, year round. According to the proposed staffing arrangements, if the security supervisor and security trainer were to each work, 40 hours per week, on separate shifts, there will be 88 hours per week during which no certified/trained security staff will be on site. Importantly, the application did not describe any security measures that would be taken to separate the living quarters from the common areas available to the entire consumer population. This is especially critical on floors where living quarters and general common areas are both located, such as the first and second floors. We note that the floor plan for the second floor identifies housing for families in crisis, a children's recreational area and family lounge along with high-traffic service delivery sites such as the cafeteria, the vocational training center, and the library. The absence of security measures sufficient to separate and secure the living quarters of vulnerable families from the cafeteria space and other general areas is a serious deficiency in this application.

0000001751

Experience
The application relates New Life's 32-year history providing housing and support services for individuals and families experiencing homelessness. The application describes New Life's largest program at the 1411 Locust Street facility, serving approximately 150 to 200 individuals, with smaller programs providing various services throughout four states. The "experience" criterion within the application packet asks the applicant to "demonstrate prior success in operating similar programs and to provide recommendations attesting to that fact by Federal, State, and local authorities." Notwithstanding New Life's commendable history of social service, the application does not present any reliable information to support New Life's assertion that it has experience relevant to operate a program five times larger in a facility approximately nine times larger than its largest current facility. The application shows no evidence of prior success or experience operating a program similar to the size and scope of the one proposed here. The inadequacies of the application's proposed services plan, discussed above, further support our conclusion that New Life is unprepared to acquire the Abram Federal Building.

The application includes letters of support from members of the Missouri State Senate, the Missouri House of Representatives, six letters from local organizations, and a petition with roughly 300 signatures from persons currently experiencing homelessness. Missing from the application, however, are the required letters of support from Federal or local (city) officials attesting to New Life's prior success operating similar programs to the one proposed for the Abram Federal Building. Notably absent from the application was any evidence of collaborative relationships with other homeless service providers in the community. Although not a Title V requirement, such relationships are acknowledged by prevailing authorities as important to the successful implementation of large-scale social services programs. Failure to participate in collaborative relationships, such as the City of St. Louis Continuum of Care, will have a negative impact on the services to be provided to consumers of New Life, as it will decrease the availability of a variety of additional services that are made available by providers other than New Life.

Financial Ability
Our review also concludes that New Life's projected costs for program and facility operations are severely underestimated. Title V applicants must also show the ability to finance and operate the proposed program. This requirement includes the financial ability to assume custody, care, and maintenance of the property. See 45 C.F.R. § 12a.9(b)(4). The Abram Federal Building is approximately 45 years old and still operates most of the original mechanical systems, including the elevators, chillers, fire alarm system, and motors. In August 1993, the General Services Administration authorized an independent contractor, Gastinger and Walker Architects, Inc., to prepare a Prospectus Development Study for the renovation of the Abram Federal Building. The initial estimate, for budgetary purposes, was $34,000,000 and included the replacement of major building systems with the exception of the roof and plumbing systems, which are currently in need of substantial upgrading or replacement. The estimate did not include design costs, which

0000001752

would have added another estimated $1,700,000 to the project.[2] In today's market, using the Consumer Price Index and including the roof replacement, plumbing upgrades and design costs, the project amount would increase to over $49,000,000 to keep the building functional. A select list of the most expensive deteriorating conditions that must be addressed to implement the proposed program include replacement of the roof or, at the very least, the repair of four substantial leaks; remediation of asbestos and lead-based paint; repair of plumbing piping; and repair of crushed drain lines in the basement. In addition to the renovation costs, yearly operation costs for the maintenance of major mechanical systems, custodial services, trash removal and utilities are currently peaking at $950,000. Deregulation of the utilities followed by an anticipated substantial increase in electrical costs, and the proposed change in operating hours (from 12 hrs. a day, 5 ½ days per week to 24 hours, 7 days a week) will substantially increase operational costs to well over $1,000,000 per year.

In addition to the severe underestimation of facility rehabilitation and operating costs, the application also fails to consider program costs necessary to implement the proposed program. New Life anticipates having only eight salaried staff in the first year of operations, with twelve by the third year. As we concluded regarding the "services offered" evaluation criterion, to operate the proposed program with success demands qualified professional staff and personnel; this translates to necessarily higher operating costs, which are unaccounted for in the application. New Life's budget does not identify specific line item costs associated with running the many services proposed, such as food for the meals proposed to be served three times daily in the cafeteria.

Although the application envisions a plan to solicit funding in the amount New Life estimates to be appropriate for the first three years of operations, the identified funding sources are too speculative to support a determination that New Life has the needed financial ability. The application estimated expenses in the first year to be approximately $3,500,000. The proposed revenue for the same year is $4,300,000. However, only $800,000 in revenue comes from sources that are subject to reasonable estimations, such as the expected profit from Digital TV sales and the sale of New Life's real estate assets. Instead, the application identifies the majority, over eighty percent ($3,500,000 of the budgeted revenue of $4,300,000), of first-year funding to be acquired through fundraising, grant awards, or in-kind donations. However, the application provides neither a history of past, successful fundraising efforts, nor a track record of successful grant writing. Revenue from in-kind donations is inherently unpredictable, and the application is also devoid of any record of success in this area of fund raising. We note that because New Life is not a participant in the St. Louis Continuum of Care Network, it is ineligible to apply for McKinney-Vento Act Title IV grant funding through the U.S. Department of Housing and Urban Development.[3] Title IV financial assistance is the largest federal funding stream for homeless programs. Finally, the application fails to mention possible alternative revenue streams that

---

[2] After receiving the 50% cost estimate for the renovations, GSA cancelled the completion of the study due to the high estimated budgetary requirements.

[3] See Department of Housing and Urban Development Notice of Funding Availability, 69 Fed. Reg. 27495 (May 14, 2004).

0000001753

could be accessed if either the fundraising or grant efforts are unsuccessful. Although, the application proposes to use the proceeds from the sale of excess landholdings and cash reserves in the first year of operation, no other alternative revenue streams are mentioned for successive years of operation. Accordingly, we conclude that the application fails to accurately assess the enormous financial obligation associated with the operation of a program of this magnitude in such a large and deteriorating physical structure, and that the application does not evidence sufficient financial resources to fund actual projected costs.

Conclusion

In conclusion, HHS has determined that your application on behalf of New Life is denied because you have failed to make the necessary showing under the "services offered," "experience," and "financial ability" evaluation criteria. This represents HHS' final decision on your application. We regret that we are unable to approve your application and wish you success in your ongoing efforts to assist the homeless in St. Louis.

Sincerely yours,

Heather M. Ransom
Director, Division of Property Management
Program Support Center

0000001754